## WATSON v. YOUNG.

1. In action by A, a creditor, against B and the heirs of C, to set aside the deed made to B in fraud of C's creditors, plaintiff cannot testify to what the wife of C told him that C had said as to the deed being made in B's name.

2. Testimony by the attorney of C of what C had said to him when he drew the deed in B's absence, was incompetent, because it was both hearsay and a confidential communication.

3. Where land is paid for with the money of him who takes the title, there is no resulting trust, and to raise a constructive trust *ex maleficio*, there must be actual fraud. In this case there was neither.

4. Neither the subsequent sale by the vendee of a part of this land for as much as he had given for the whole, nor the retention of possession by C, who never had any title, shows a trust for C or a fraud as to his creditors. This case distinguished from *Smith* v. *Henry*, 2 Bail., 118.

5. Findings of fact by the Circuit Judge from testimony reported to him by the master in a chancery case, reversed.

Before NORTON, J., Anderson, February, 1888.

The opinion fully states the case.

*Messrs. Broyles & Simpson*, for appellant.

*Mr. E. B. Murray*, contra.

February 13, 1889. The opinion of the court was delivered by

MR. JUSTICE McGOWAN. Judgments were recovered against David A. Keasler, principal, and the plaintiff, Watson, as surety, for about $550, which the surety (Watson) was required to pay, and he thereby became a judgment creditor of the said Keasler, who died intestate and insolvent in 1883, leaving a widow, Jemima, and several children as his heirs at law. At the time of his death the said intestate, Keasler, was living upon a small tract of land, originally containing 37½ acres, near the village of Pendleton, the legal title of which was in the defendant, Charles W. Young; and this action was instituted by Watson, the judgment creditor of Keasler, against Young and the heirs and representatives of Keasler, to set aside the title deed of Young upon the ground that the intestate, Keasler, in his life-time "purchased and paid for the land," and had the title made to the said Young, to hold the same in order to defeat and defraud the creditors of the said Keasler, praying that the land should be declared to be the property of the intestate, Keasler, and sold for the payment of the plaintiff's judgments and the other debts of said intestate.

The defendant, Young, answered, denying the allegations of the complaint, that Keasler, in his life-time, furnished the money to buy the land, and title was made to him (Young) to defraud the creditors of Keasler. But, on the contrary, averring positively that he purchased the land from Samuel Lovingood and George R. Cherry for $200, which he paid with his own money, and on May 2, 1881, received from them an absolute title deed for himself, in good faith, and not as alleged, in combination with Keasler, for the purpose of defrauding his creditors. The children of the intestate (Keasler) either made default or filed merely a formal answer. But the widow, Jemima, being administratrix,

10—30

as well as heir at law, answered, stating that John T. Sloan originally owned the land, and as he was carrying on a tanyard in the immediate neighborhood, he employed her husband in that business, and put him in possession of the land, where he and his family continued to reside (except about two years, when he worked on the railroad) until the time of his death; that she did not know whether her husband ever had title or purchased or paid for the land, or any part thereof, nor why the deed was made to Young; and if there was any fraud in the same, that she had no knowledge of it, &c. In case the deed to Young should be set aside, she claimed dower in the premises.

It was referred to the master, W. W. Humphreys, Esq., to take and report the testimony, which is printed in the record. In brief, it appeared that the parcel of land in question belonged to John T. Sloan, sr., who, about the beginning of the war (1861 or 1862), employed the intestate, Keasler, as a hand in his tanyard near Pendleton, and put him on this little piece of land; but there was no writing, and it did not appear under what arrangement he was let into the possession, whether as a mere employee in the tanyard, or under some parol contract to purchase. Keasler made some small improvements (by whom paid for was not shown), and continued to live there with his family (except about two years) until his death in 1883. He habitually spoke of the place as his own, and for some years paid taxes on it, but seems never to have had title or any other writing of any kind whatever.

Soon after the war (1868) John T. Sloan, becoming embarrassed, conveyed the land to Lovingood & Cherry on a debt he owed them. This deed was never recorded, but Keasler knew that the land had been conveyed to them, and negotiated with them for its purchase. They held titles to the land for thirteen years, offered to convey it to Keasler for $200, but after several unsuccessful efforts on his part to raise the money, they sold and conveyed it for that sum ($200) to the defendant, C. W. Young, who paid for it, took the titles in his own name (May 2, 1881), and at once recorded the same. Soon after, on May 6, 1881, in the life-time of the intestate, Keasler, and without objection upon his part, Young conveyed six acres of the land to Elias Winston,

stated to be in consideration of $120; and the next year (1882) he contracted with Andrew Gaillard to sell him about $4\frac{3}{4}$ acres at the price of $95. The defendant, Young, had a chain of paper title, and the only question was whether, as alleged, "Keasler, in his life-time, purchased and paid for the land." The Circuit Judge found as follows:

"On April 4, 1882, C. W. Young obtained title from George R. Cherry and Mrs. M. Josephine Verner (who was sole heir of Samuel Lovingood), paying Mrs. Verner one hundred dollars in money, and paying Cherry one hundred in a store account for that and the following year. On April 6, or two days after the deed to Young, he (Young) sold to Elias Winston six acres of this land for $120. * * * During the same year Young sold $4\frac{3}{4}$ acres to Andrew Gaillard for $95, for which he received the money. * * * Keasler remained in possession of the balance of the property without paying rent, and at his death his family retained the possession and exercised control of the property for two years. It thus appears that Keasler's possession did not change in its character after the making of the deed to Young, and Young was more than reimbursed by the sale of the two lots for the purchase of the place. and also obtained the advantage in his business of Cherry's trade for one-half of the alleged purchase money of the tract of land. The testimony of the plaintiff and Mrs. Keasler conflicts in material respects with that of defendant, Young, but in the view of the case taken by me, it is not necessary to consider these conflicts. The facts satisfy me that the defendant, Young, took the title for the benefit of D. A. Keasler, and was fully paid for this act on his part by the sale of lots, as above set forth;" and therefore he set aside the deed to Young, except as to the lots sold to Elias Winston and Andrew Gaillard, "which, being sold to pay the purchase money due on the property, were confirmed to the purchasers," &c.

From this decree the defendant, Young, appeals to this court upon the following exceptions:

"1. For error in holding that the land in question was paid for by Keasler, when the proof was that he died insolvent; that within a short time before his death he was endeavoring to borrow $200 to pay for the land, which he was unable to do, and,

contrary to the declarations of Keasler himself, that he had never paid for the land, and had no title to it—that it belonged to the defendant, Young, and he was renting it from him.

"2. For error in finding that the land was conveyed to defendant, Young, 'for the benefit of Keasler,' when the uncontradicted testimony of J. D. Verner and Mrs. Cherry, as well as the defendant, Young, was that the defendant purchased and paid for the land for himself and his own benefit.

"3. For error in finding 'that Young, having sold off two lots to Winston and Gaillard for $200, the amount of the purchase money paid by him for the land, and having obtained the advantage in his business of Cherry's trade for his half of the alleged purchase money,' he was fully reimbursed, and that Keasler was entitled to the balance of the tract, when there was no proof whatever that Keasler ever paid a dollar of the purchase money to any one, or that he advanced any part of it at the time of Young's purchase from Verner and Cherry, or to defendant Young afterwards.

"4. For error in setting aside the deed to Young on the ground that it was upon a secret trust to protect the land from Keasler's debts, when Young had no motive whatever for embarking in such a scheme, and when there is not a particle of proof that Keasler advanced the purchase money, or any part of it, at the time of Young's purchase, or to Young afterwards.

"5. For error in this, that fraud must be proved, and that Young embarked in this fraudulent scheme is not to be inferred against him from the mere declaration of Keasler in his absence, and without his knowledge or consent.

"6. Because the testimony of J. C. Whitfield as to the declarations of Keasler, that he desired a deed drawn from John T. Sloan to defendant, Young, so as to avoid the sale of the land under judgment against him (Keasler), made in Young's absence, and without his knowledge or consent, was clearly incompetent, and so ruled by the master; and the Circuit Judge erred in overruling the master and admitting the testimony, because the objection was not based upon the proper ground.

"7. Because the statement by Mrs. Keasler to the plaintiff, Watson, and testified to by him, that Keasler had told her that

the title was put in Young's hands because he (Keasler) was in debt and could not take the title, was also clearly incompetent, and is not evidence to support the decree.

"8. Because there is no proof whatever that the purchase money of the two lots of land sold to Elias Winston and Andrew Gaillard was ever paid to Young, whereby he was reimbursed, as alleged in the decree.

"9. For error because, while the Circuit Judge says that the testimony of the plaintiff and Mrs. Keasler conflicts in material respects with that of the defendant, Young, he deems it unnecessary to consider these conflicts, when such conflicts should have been carefully considered by him in rendering his decree.

"10. Because the facts found by the Circuit Judge are unsupported by the testimony."

*First.* In regard to the preliminary question as to the admissibility of the testimony received.

(1) Was it error to admit the testimony of the plaintiff "that Mrs. Keasler said to him that Dave Keasler told her that the reason the titles were put in Charlie Young's name was that he was in debt and could not take the title in his own name"? It seems to us that the admission of the testimony was error; that it was not only "hearsay," but the alleged statement of one now dead, in the absence of the party to be injuriously affected thereby. Mrs. Keasler was examined as a witness herself and testified that she knew Young, "but did not know how he obtained deed to the land; never had any conversation with Young about the place, nor did her husband ever have in her presence."

(2) Plaintiff introduced as a witness J. C. Whitfield, Esq., who (against objection) testified "that about the year 1874, D. A. Keasler consulted him as an attorney, and requested him to draw a deed of this land, saying at the time that he did not want the title in his own name; that his creditors would sell it if so made; thinks that it was in Young's name that the titles were so made. Keasler said at the time he came to get the deed drawn that John T. Sloan had signed the note and papers to S. Lovingood and George Cherry. They were talking about the papers in reference to this piece of land, and that they had agreed to take $100 apiece. From that statement witness wrote the deed. Witness

acted in the capacity of an attorney. The deed and a receipt (never executed) were drawn up on representations made by Keasler alone. Never had any conversation with Mr. Young with reference to the preparation of deed and receipt." The master refused to admit this testimony, but it was taken on a separate sheet, as provided by the act; and on this paper was an endorsement, "The decision of the master that the within testimony was incompetent, overruled, the objection to the competency not having been on the ground that witness was attorney for Keasler." We do not clearly see that the statements made by Keasler to Whitfield were, as alleged, against his interest; but, be that as it may, they were made in the absence of Young, who was not shown to be in combination with Keasler, or even to have any knowledge of the matter; besides, on their face the statements were "confidential communications" between client and attorney, and, upon objection made, they should not, as we think, have been received in evidence. See 1 *Greenl. Evid.*, § 243, and notes.

*Second.* Then as to the merits. This being a suit "in chancery," it is incumbent on this court, as an appellate tribunal, to review the whole case, subject, of course, to the well established rule of practice, that the court will not disturb a finding of fact by the Circuit Judge, unless it appears to be clearly wrong. "The presumption in favor of the correctness of the Circuit decree must be completely rebutted, on considerations arising from the evidence, if it appears that there was contradictory testimony, in order to reconcile which the character and position of the witnesses must be considered as presenting a question of credibility." See *Livingston* v. *Wells*, 8 S. C., 356. The Circuit Judge did not make a statement of the facts found and his conclusions of law separately, and we cannot therefore have a clear view of the evidence which induced the general remark by him, viz.: "The facts satisfy me that the defendant, Young, took the title for the benefit of D. A. Keasler." Considered only in reference to the written evidence, was that finding clearly erroneous? The question is mainly one of fact. We have read the testimony carefully, and find it in some respects conflicting, and generally circumstantial and very vague. Keasler, as well as Lovingood and Cherry

(who executed the deed assailed), are all dead. John T. Sloan, under whom the parties claim, is still living, but for some reason he was not examined. So that the only one of the immediate parties familiar with the facts, who was sworn in the case, was the defendant, C. W. Young, who testified most positively that "he did not receive any part of the consideration from any one; paid for the land with his own money, and did not take the deed with any trust, secret or express; it was a square, fair deal," &c.

This testimony, it seems, received small consideration in the court below, the Circuit Judge simply dismissing it with the remark that, "the testimony of the plaintiff and Mrs. Keasler conflicts in material respects with that of the defendant, Young; but in the view of the case taken by me, it is not necessary to consider these conflicts." It seems to us that Young's testimony is strongly corroborated by that of both Mrs. Cherry and J. D. Verner, especially in reference to the important particulars of the deed executed to him and the payment of the purchase money. Some time about the beginning of the late war (1861 or '2), Keasler entered into the possession of the land under John T. Sloan, sr. It is not quite certain, but assuming that he entered under some verbal contract to purchase, it does not appear what were the terms of that contract, or whether Keasler ever paid anything on it. We only know that Sloan (in 1868), without objection on the part of Keasler, conveyed the land to Lovingood and Cherry; that they offered it for $200 to Keasler, who made several efforts to raise the money, but finally failing to pay the price, they (L. and C.) sold and conveyed it to the defendant, Young, for the price aforesaid, $200, which he certainly paid with his own money, and had the title executed to himself. So that it is quite clear that the land was not paid for by Keasler or with his money, and therefore there was no resulting trust in his favor. *Ex parte Trenholm*, 19 S. C., 126; *Nesbitt* v. *Cavender*, 27 *Id.*, 1.

But, as we understand it, the further view is urged that even if there was not a technical resulting trust in favor of Keasler, yet the legal title to the land was acquired by Young under such circumstances as to impress upon it a constructive trust, *ex male-*

*ficio,* in favor of Keasler. In order, however, to make out such a trust it was necessary to show upon the part of Young actual fraud, such as misrepresentations, concealment, undue influence, taking advantage of one's weakness or necessities, &c. See 2 *Pom. Eq. Jur.,* §§ 1053 and 1055; *Nesbitt* v. *Cavender, ante* 33. Was it shown that Young committed such fraud in obtaining the legal title? We do not see the evidence which connects him directly or indirectly with any agreement to purchase the place "for the benefit of Keasler," or which shows that he was guilty of any concealment or misrepresentation towards him. Doubtless, he was aware that the land had been offered to Keasler for $200, and that he had finally failed to meet the offer; but we do not think that was sufficient to debar him from purchasing on his own account, provided he used no misrepresentation or concealment and purchased *bona fide* for himself. It might have been a kind act in Young to use his own means in purchasing the place for the benefit of Keasler; but we do not see that he was under any obligation, legal or moral, to do so; and we do not think that we are authorized to assume or infer the fact from the evidence found in this case. Courts are disinclined to presume fraud without satisfactory proof.

It was argued that the price agreed to be given for the two lots sold by Young after he acquired the title, should be set down to the credit of Keasler, and considered as full reimbursement of Young for the purchase money paid by him. That would be assuming, it seems to us, that the land was purchased "for the benefit of Keasler," which was the very point in dispute. We do not see how these sales could operate retrospectively, so as to affect the *bona fides* of a deed already executed.

It was also strongly urged for the plaintiff, that the possession of Keasler was allowed to remain "unchanged in its character," after the conveyance to Young, which alone, according to *Smith* v. *Henry* (2 Bail., 118), afforded the evidence that the conveyance to Young was "colorable and fictitious," and really for the benefit of Keasler. We don't think it is exactly correct to say that the possession of Keasler "remained unchanged in its character." Young recorded his deed immediately and sold off two lots. But without going into that, we do not think that the doc-

trine of *Smith* v. *Henry* is properly applicable to this case.    In that case a donor was allowed to retain possession after he had conveyed his lands and slaves to relatives. In this, Keasler never had title to the land, never paid for it, and cannot, in any proper sense, be considered the "donor."

The judgment of this court is, that the decree of the Circuit Court be reversed, and the complaint dismissed.